[No. 1555.]

THOMAS KNUTSON v. THE STATE.

1. THEFT—INTENT—BURDEN OF PROOF.—A fraudulent taking of property with the intent on the part of the taker to deprive the owner of its value, and to appropriate the same to his own use, is an essential element of theft, which must be established by the State beyond a reasonable doubt before a conviction for theft can be legally had.
2. SAME—FACT CASE.—See evidence held insufficient to sustain a conviction for horse theft, in as much as it fails to show the necessary fraudulent intent.

APPEAL from the District Court of Henderson.  Tried below before the Hon. F. J. McCord.

The indictment charged the appellant with the theft of a horse, the property of W. H. Martin, in Henderson county, on the first day of September, 1882.  The verdict of guilty assessed his punishment at confinement in the penitentiary for a term of five years.

W. H. Martin was the first witness introduced by the State. He testified that he had known the defendant for several years. In the winter of 1881, the defendant, who was then in jail, sent for the witness and requested witness to bail him out.  This the witness refused to do, and the defendant then said that he desired to employ the witness to defend him in the case then pending against him.  The witness agreed, and the defendant gave him a claybank horse as his fee.  Witness got the horse and kept

him a while, during which time he was ridden by witness's boys after cattle. He was then turned on the range four or five miles from the witness's residence. Shortly after the defendant employed the witness, he secured bail and was released from jail. The witness afterwards saw the horse in the possession of the defendant. He told the defendant that he must quit riding that horse, and the defendant promised that he would. The witness at no time consented to the taking or using of this horse by the defendant or other person. He represented and acquitted the defendant in the case for which as a fee this horse was given him.

W. W. Robertson testified, for the State, that in the summer of 1882 he saw the horse once owned by the defendant, and which was said to have been transferred by him to the witness Martin. The horse at that time was necked to another, and was turned into the witness's pasture by the defendant and one Chancey. He remained in the pasture for several days. This pasture was seven or eight miles from Martin's. The defendant and Chancey left the witness's house with the horses still necked. They were driving a small herd of cattle at the time. The witness did not know where they went, but Chancey usually drove his cattle to Corsicana.

Cross-examined, the witness stated that he had heard but did not know of his own knowledge that the defendant had ever transferred the horse to Martin. The defendant was in the employ of Chancey, who was a cattle buyer. Chancey had bought a great many cattle in the witness's neighborhood during the preceding three or four years, and was in the habit of penning them in the witness's pasture. This pasture is about three quarters of a mile from the little town of Malikoff. The witness had never seen the defendant using the horse in question. The horse was in the witness's pasture for three or four days, during the most of which time the defendant and Chancey were out after cattle. This pasture was in or near the horse's range, and about two miles from the house of Martin. They left the witness's house in the day time, going in the direction of Malikoff, which is on the road from the witness's house to Corsicana, to which town Chancey generally drove his cattle. The witness did not know to whom the horse belonged which was necked to the horse in question. He did not hear Chancey or the defendant claim either of the horses. He had never seen the claybank horse since.

A. S. Tanner testified that he lived in the town of Malikoff, which is near the Navarro county line. He had known the defendant for three or four years, and knew the horse he was said to have transferred to Martin. During the summer of 1882 the defendant passed through Malikoff with Mr. Chancey, going towards Corsicana. They were driving a herd of cattle, and also this horse necked to another.

Cross-examined, he stated that Chancey was a cattle buyer, who lived in Corsicana. He had bought a great many cattle in the Malikoff neighborhood, and usually penned them at Robertson's. The witness supposed that this herd was his. The defendant, who lived in that neighborhood, was in the employ of Chancey. The horse ranged in that neighborhood. These parties passed through Malikoff in the morning about nine o'clock.

The defense first introduced W. H. Martin, and asked him in substance if he did not, shortly after the defendant's release from jail, meet John Clay in the public road, at a certain place, and ask the said Clay how his (Martin's) "claybank horse" was getting along; how he liked the range, and if he was not a "wild, fool kind of a horse;" and did not Clay answer that he was such a horse; and did not he (Martin) there and then say to John Clay: "You, Tom Knutson and the other boys may take up that horse and use him until I call for him." To these questions the witness answered: "No, I don't think I ever had such a conversation. If so, I have no recollection of it. I never gave anybody my consent to ride my horse."

John Clay was the second witness introduced by the defense. He testified that he knew the horse the defendant let Martin have. When the defendant gave bond and was released from jail, about January 1, 1882, which was after he had employed Martin, the witness took the defendant this same horse, and the defendant rode him home. The witness had seen him ride this horse several times since then, and had seen him ride the horse since the disposition of the case against him, for services in which he gave Martin the horse. Some time in the spring of 1882, and after the disposition of that case, the witness in passing Martin's house saw that gentleman. Martin on that occasion asked the witness about the horse. He asked if he was not a wild, fool kind of a horse. The witness told him that he was, and that he would pitch. Martin then said: "You, and Tom Knutson and the other boys can ride and use him until I call for him."

Cross-examined, the witness said that he did not tell the defendant about Martin's saying that he could use the horse, until the defendant came to him and asked him about it after his arrest. The witness did not remember to whom he told this. The defendant must have derived his information from some of the neighbors. The witness, when he was asked by defendant, told him what Martin said, and he thereupon had the witness subpœnaed. The witness, who lived in the same neighborhood in which the defendant lived, and in which the horse ran, often saw the defendant riding the horse during the spring of 1882. After he was indicted, the defendant told the witness that he took the horse to Corsicana and left him at Chancey's.

Tom Chancey was the next witness for the defense. He testified that he lived in Corsicana, and for several years had been engaged in buying cattle in Henderson and adjoining counties, and of using the pasture of W. W. Robinson to pen them. He had bought at least four hundred head of cattle in Henderson county. The witness had known the defendant since December, 1881, about which time he employed him to assist in driving cattle. He understood then that there was a case pending against the defendant in the District Court, and that he was out on bond. The defendant was using a yellow horse at that time, which he always said was the property of W. H. Martin. He at no time pretended that he had a claim to him, but repeatedly refused to trade him because he was the property of W. H. Martin. In May, 1882, the witness made other purchases of cattle in Henderson and Anderson counties, and again employed the defendant. The case against the defendant had then been disposed of. The defendant again took up the same yellow horse, asserting that the horse belonged to W. H. Martin, and denying any claim himself.

*En route* to Corsicana with fifty or sixty head of cattle, after having remained at Robinson's pasture four or five days, the witness and the defendant passed through the town of Malikoff, and he thinks that he saw A. S. Tanner on that occasion. The defendant was riding the yellow horse when they passed through Malikoff. He remained with the witness a few days at his house in Corsicana, when the witness purchased his saddle, bridle and blanket. He then left on the train, saying that he was going to Madison county. He requested the witness to take the yellow horse back to Martin when he returned to Malikoff. This the witness promised him that he would do. The horse remained in

the witness's pasture about two weeks, when he and a black mare broke out and ran away. The witness found them after a search of six or eight days, and returned them to the pasture. Two weeks thereafter the witness and Charley Pickle rode the yellow horse and black mare around the neighborhood, and finally turned them out on the prairie near the witness's house. Since that time the witness has seen neither of them, though he hunted several days for them. This was about July, 1882. The defendant left for Madison county about the first of June, and returned about the first of August, which was about four weeks after the two horses ran away. The witness again employed him.

Cross-examined, the witness stated that a short time after the defendant left for Madison county, and while the horse was in his pasture, he made a trip to Henderson county to purchase cattle, and while there sent W. H. Martin word that his horse was in his, witness's, pasture. He could not say that Martin ever received the word. The witness made one or two trips to Henderson county while the horse was in his pasture. He felt quite certain that the defendant was riding the yellow horse when he and the witness passed through Malikoff *en route* to Corsicana, because the horse would not drive. Two days were consumed in going from Robinson's pasture to Corsicana. It was the practice of the witness to take several horses with him on these trips, as reliefs. He did not remember how many he had on this trip. His contract with the defendant was to furnish him riding stock. The backs of all his horses were then sore; so was that of the yellow horse, but it was not in as bad a condition as the witness's horses. The witness felt quite certain that the defendant rode the Martin horse through the town of Malikoff on that trip, because, as stated, he would not drive. The witness repeated and emphasized this statement.

The following entry appears in the statement of facts: "The State's attorney, after many other questions, asked Chancey: 'Do you know who got that horse?' The witness gave no positive answer, but said: 'I suppose the horse ran away.' The same question was propounded again and again, when the witness turned his head and declined to answer. The defendant's counsel recalled this witness next morning and asked him if he knew who got the horse. He replied that he did not."

The next witness for the defense was Charley Pickle. He testified that he was employed by Chancey to help him diver

some cattle from Anderson county, about December, 1881. The defendant was with Chancey at that time, and was riding a yellow horse. The witness proposed to trade for him. The defendant refused, saying that the horse belonged to Mr. W. H. Martin, and that he could not trade him. Some time in June, 1882, the witness saw the same horse at Chancey's, in Navarro county. Chancey rode that horse about the neighborhood with the witness. That night he turned the horse out on the prairie, and the witness had not seen him since.

Cross-examined, the witness stated that he saw four or five horses at Chancey's on the occasion last referred to. All save a sorrel had sore backs. The yellow Martin horse's back was as sore as any of them. Witness knew nothing about the present whereabouts of the horse.

The motion for a new trial assailed the sufficiency of the evidence to sustain the verdict.

*Faulk & Faulk*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

WILLSON, JUDGE.   To constitute theft the taking of the property must be fraudulent, with the intent on the part of the taker to deprive the owner of the value thereof, and to appropriate the same to the use or benefit of the taker. (Penal Code, Art. 724; *Camplin* v. *The State*, 1 Texas Ct. App., 108; *Dunham* v. *The State*, 3 Texas Ct. App., 465.) It devolves upon the prosecution to prove, beyond a reasonable doubt, that the property was taken with the intent above stated, and that such intent existed at the time of the taking. (*Reed* v. *The State*, 8 Texas Ct. App., 40.)

In this case, we regard the evidence as wholly insufficient to establish a fraudulent intent on the part of the defendant in taking the horse. On the contrary, we think the evidence shows, at most, a mere trespass; a taking of the horse for temporary use only, with no intention to deprive the owner of the value thereof, or to appropriate the same absolutely to his own use or benefit. In our opinion the conviction is without sufficient evidence to support it. and the judgment is reversed and cause remanded.

*Reversed and remanded.*

Opinion delivered October 13, 1883.